UNITED STATES of America and John
G. Shea, Special Agent, Internal
Revenue Service, Petitioners,

v.

COOPERS & LYBRAND et
al., Respondents,

and

Johns-Manville Corporation, Respondent
in Intervention.

Civ. A. No. 75–F–420.

United States District Court,
D. Colorado.

Nov. 3, 1975.

James L. Treece, U. S. Atty., Denver, Colo., S. Martin Teel, Jr., Tax Div., U. S. Dept. of Justice, Washington, D.C., for petitioners.

William E. Murane, Paul T. Ruttum, Holland & Hart, Denver, Colo., for respondents.

Peter H. Holme, Jr., James E. Bye, Charles J. Kall, Holme, Roberts & Owen, Denver, Colo., for respondent in intervention.

## MEMORANDUM OPINION AND ORDER

FINESILVER, District Judge.

THIS ACTION is brought for judicial enforcement of two Internal Revenue Service [IRS] summonses issued pursuant to Section 7602 of the Internal Revenue Code of 1954, 26 U.S.C. § 7602, in furtherance of an IRS investigation into the correct income tax liabilities of Johns-Manville Corporation [J–M] for the years 1971 and 1972.

J–M is a major national corporation having subsidiaries and affiliates throughout the United States and abroad; a principal office is south of Denver, Colorado. Both summonses are directed to Coopers & Lybrand [C & L], a national firm of independent certified public accountants with offices in Denver, who examined and reported on the consolidated financial statements of J–M for the years 1971 and 1972.

The first summons, issued December 6, 1974, directed the respondents, C & L, and Edward E. Bolle, managing partner, to appear before IRS Special Agent John G. Shea to testify and to produce for inspection certain books, records and other papers generated by C & L in connection with the examination and audit of J–M financial statements. Specifically, the summons sought testimony relating to and production of:

All workpapers, correspondence, memoranda, and other documentation contained within or attendant to, such files as are maintained by Coopers & Lybrand relative to the certified audit of Johns-Manville Corporation for the calendar years 1971 and 1972, including, but not limited to the following:

Engagement Letter
Representation Letter
Management Letter
History file
Audit Program
Audit Workpapers
Correspondence file, internal and external
Memoranda, internal and external

Bolle appeared in response to the summons, produced voluminous workpapers and documents, but declined to provide or testify concerning (1) the Audit Program; and

(2) a Tax Pool Analysis file and related papers.

A second summons, issued January 23, 1975, directed the respondent, Ed Kerans, an employee of C & L, to appear and testify with regard to the items previously summoned. Kerans appeared, produced all remaining documents sought, except the Tax Pool Analysis file and related papers and the Audit Program. Likewise, Kerans declined to testify concerning these materials.

On April 21, 1975, the United States filed this petition, with the supporting affidavit of Special Agent Shea, for judicial enforcement of the summonses under the authority of Sections 7402(b)[1] and 7604(a)[2] of the Code. A show cause order was issued by this Court on April 22, 1975.

Subsequently, over objections of the IRS, J–M was granted leave to intervene. We are satisfied that J–M has raised a justifiable expectation of privacy as to the Tax Pool Analysis file and has therefore asserted a sufficiently protectable interest to warrant its intervention here. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Continental Bank & Trust Co.*, 503 F.2d 45, 49 (10th Cir. 1974). Also, due to the very nature of the underlying documents, projections, and opinions of J–M tax personnel which contributed to the development of the Tax Pool Analysis, persuasive reasons are present for the intervention of J–M. *See Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580, 589 (1971); *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

Post trial the Government brought to the Court's attention the opinion in the case of *United States v. Arthur Andersen & Co.*, Miscellaneous No. 75–162 (E.D.Pa., Aug. 8,

1. 26 U.S.C. § 7402(b) provides:

(b) *To enforce summons.*—If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, or other data, the district court of the United States for the district in which such person resides or may be found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, or other data.

2. 26 U.S.C. § 7604(a) provides:

(a) *Jurisdiction of district court.*—If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data.

1975) where the Court found that a corporate taxpayer did not have a significant protectable interest in a file relating to its auditor, Arthur Andersen & Co. We have reviewed the opinion in this case and have the pleadings and briefs filed therein in hand. That holding is not persuasive here. Although other grounds were argued, the principal contention of the corporate taxpayer in the *Arthur Andersen* case, *supra,* was that "the information requested in an invalid summons would constitute a violation of the corporation's accountant-client privilege." That contention is not involved in this litigation.

A full evidentiary hearing was held on the issues joined, and all legal points were extensively briefed. Upon the briefs submitted and the testimony and oral argument presented, we deny the petition for enforcement of the summonses.

## I.

### ISSUES

In our view, the character of the materials and documents summoned is the pivotal element in our consideration. Accordingly, the relevant features of the Audit Program and the Tax Pool Analysis File are highlighted.

The Audit Program is a detailed master plan prepared by C & L for and prior to its examination of the consolidated financial statements of J–M. The program consists of (1) a listing of procedures to be followed by C & L personnel throughout the United States in examining the books and records of J–M; (2) records confirming that such procedures were followed; and (3) suggestions for future modifications of such procedures.

The Tax Pool Analysis File and related papers [Tax Pool] contain estimates of J–M's contingent liability for future income taxes based upon the opinions and projections of J–M tax personnel. Inherent in the Tax Pool Analysis is the clear recognition by J–M personnel that the tax treatment and projections of J–M may be interpreted differently by the IRS. These opinions of J–M personnel are communicated either orally or in written form by J–M tax personnel to C & L to assist C & L in their evaluation of J–M's overall consolidated tax provision. Consideration is given to such contingent liability for income taxes by J–M (a) in determining its consolidated tax provision for financial reporting purposes and (b) by C & L in its evaluation of the adequacy of such provision in the context of an examination of financial statements in accordance with generally accepted auditing standards.

C & L, with the acquiescence of its client, J–M, and under the instructions of its client, has refused to give the IRS the Tax Pool and certain pages from other files that are related to the Tax Pool. C & L, of its own volition, has refused to give the IRS the C & L Audit Program. In the presentation of testimony and oral argument J–M has been primarily concerned with the Tax Pool Analysis File and C & L with its Audit Program.

All parties have relied upon the standards for judicial enforcement of an IRS summons as set out in *United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112, 119 (1964). There the Court held that before an IRS summons requesting the records, papers, and other data of a taxpayer will be enforced four criteria must be met: (1) the investigation must be conducted pursuant to a legitimate purpose; (2) the inquiry must be relevant to that purpose; (3) the information sought must not already be within the possession of the IRS; and (4) the required administrative steps must have been followed.

The purpose of the investigation undertaken here was to determine the correct income tax liabilities of Johns-Manville Corporation for the years 1971 through 1972.[3] The legitimacy of the Government's investigation into the accuracy of J–M's tax liability has not been a point of contention in these proceedings. Under Section 7602, 26 U.S.C. § 7602:

**3.** Affidavit of Special Agent John G. Shea, April 21, 1975.

For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.

■ We regard the thrust of the instant investigation to be in harmony with the authorized statutory purposes outlined in Section 7602 and consequently, we find the first element of the *Powell* criteria to be satisfied. *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971).

Further, neither the respondents, nor the taxpayer-intervenor, have challenged the propriety of the administrative procedures utilized and we conclude that the Government has complied with the fourth *Powell* criteria as well. Beyond these two settled areas lies the dispute which gives rise to this litigation.

In its response to the show cause order the respondent, Coopers & Lybrand, contends that the Audit Program contains no factual data related to Johns-Manville's income tax liability and that any information which it does contain is irrelevant and immaterial to the IRS investigation. Additionally, C & L has most strenuously urged that significant public policy considerations militate against production of the Audit Program.

The essence of the argument advanced by the respondent in intervention, Johns-Manville Corporation, is that the IRS has had an opportunity to inspect or is in actual possession of every piece of actual data, all correspondence, and every corporate record of Johns-Manville which relates to the 1971 and 1972 federal income tax returns, as well as all audit documentation of Coopers & Lybrand that related to J–M. Further, J–M contends that the Tax Pool and related papers do not contain any factual data regarding any corporate transactions of J–M which are not recorded in the books and records of J–M. Similarly, J–M has argued that production of the Tax Pool would do violence to compelling policy consideration.

Reduced to its simplest components, it is the argument of the respondents and the taxpayer-intervenor that (1) petitioners have not met the threshold burden of establishing relevance; (2) the information sought is either in the possession of the government or could readily be ascertained from documents admittedly in its possession; and (3) strong policy reasons exist which require that production of these materials be denied.

II.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

■ Initially we conclude that the Service has failed to make the requisite showing that the Audit Program is relevant to the tax investigation pursuant to which it is sought. The evidence establishes to our satisfaction that Coopers & Lybrand has no responsibility for the preparation or review of J–M's income tax returns. J–M's returns are prepared internally by J–M's tax personnel. As a consequence, we conclude that the Audit Program was not prepared in conjunction with or connected in any

manner to the preparation or filing of J–M's 1971 and 1972 income tax returns.

The Government does not dispute this conclusion, but contends that the Audit Program would provide petitioners with an understanding of exactly which areas of J–M's books were audited by C & L, and consequently help corroborate the correctness of those areas of the taxpayer's books. While we concede that the Government's argument suggests an appealing opportunity to supplement its auditing efforts with those of an independent accountant, we do not regard it as a sufficient showing of relevance to support the petition. As the Eighth Circuit noted in *United States v. Matras*, 487 F.2d 1271, 1275 (1973), the term "relevance" connotes and encompasses more than "convenience."

We find from the evidence presented that the Audit Program does not contain any factual data regarding any corporate transactions of J–M; rather it consists solely of a listing of procedures to be followed by C & L personnel throughout the United States in examining the books and records of J–M, documentation of the extent to which such procedures were followed, and suggestions for the future modification of such procedures.

The Audit Program was prepared prior to C & L's 1971 and 1972 audits of J–M. During the course of the 1971 and 1972 audits, the only information recorded in the Audit Program was (1) confirmation by C & L personnel that the Audit Program procedures were complied with or (2) explanations of why the procedures were inapplicable in certain instances, and (3) modifications of the Audit Program.

The Service seeks to buttress its argument of relevance by the following reasoning: If fraud is suspected and the IRS brings suit against J–M, the taxpayer will probably raise the defense that an independent source, *i. e.*, an accountant, has certified the books; therefore, any error was not an intentional omission or evasion. Should J–M raise this defense, evidence establish-

ing which of J–M's transactions were audited and which were not would allow the Government to respond to the defense. Coopers & Lybrand has challenged this rationale as reaching beyond the jurisdictional limits of Section 7602, which authorizes the issuance of a summons for determining the correctness of any tax return or for ascertaining any tax liability. We agree.

During the presentation of its case, the Service offered the testimony of Mr. Sam R. Grissom. Mr. Grissom serves as a large case manager for the IRS Audit Division, and is currently engaged in the investigation of the tax liability of J–M for the years 1971 and 1972. On redirect examination by Government counsel, Mr. Grissom testified:

Q: Mr. Grissom, have you ever, in the course of an audit, been shown an Audit Program?

A: Yes, I was shown an Audit Program on one occasion.

Q: Was it relevant to the audit?

A: It supported the argument that the accountants had gone into the matter and resolved it.

Q: You considered it to be relevant information?

A: I accepted it as verification of the taxpayer's position, yes.[4]

On recross examination by counsel for Coopers & Lybrand, Mr. Grissom continued:

Q: Is that the sole basis for your claim of relevancy?

A: I accepted it as verification of the taxpayer's position because the other records were not available which were examined by the accountants and I accepted it as being relevant. They had gone into it, and they had concluded that the transaction was handled properly.

Q: You used this is a situation where the original records of the taxpayer were not available; is that correct?

A: That's correct.[5]

On this point, we are persuaded by the evidence presented on behalf of the Govern-

---

**4.** Transcript of record at p. 100.

**5.** *Id.* at pp. 102–03.

ment that the C & L Audit Program is not sufficiently related to the IRS investigation in progress here to require its production. J–M has not been charged with fraud; the original records which would verify the taxpayer's position are not unavailable; and J–M has not asserted the argument that the returns are accurate because they were certified by an independent accountant.

We do not presume that circumstances could not be envisioned which might warrant disclosure of an Audit Program; we merely find here that the requisite nexus between the inquiry at issue and the material sought is insufficient.

The respondents, Coopers & Lybrand, Bolle, and Kerans, have urged us to consider in our analysis of the Audit Program issue certain policy considerations which they contend bear upon the basic integrity of the periodic audits which the law requires be performed by independent accountants. The Government has strenuously objected on the ground that we have no authority to graft a fifth element onto the criteria established by the Supreme Court in *Powell* for judicial enforcement of an IRS summons.

■ We do not feel that considerations of policy and burdensomeness are inappropriate in the context of a judicial enforcement proceeding. *See United States v. Continental Bank & Trust Co.*, 503 F.2d 45 (10th Cir. 1974); *see also United States v. Bisceglia*, 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975); *United States v. Humble Oil & Refining Co.*, 488 F.2d 963 (5th Cir. 1974), *vacated and remanded*, 421 U.S. 944, 95 S.Ct. 1670, 44 L.Ed.2d 98 (1975), *affirmed*, 518 F.2d 747 (5th Cir. 1975); *Foster v. United States*, 265 F.2d 183 (2d Cir. 1959), *cert. denied*, 360 U.S. 912, 79 S.Ct. 1297, 3 L.Ed.2d 1261 (1960); *United States v. Williams*, 337 F.Supp. 1114 (S.D.N.Y.1971), *appeal vacated and dismissed*, 486 F.2d 1397 (2d Cir. 1972).

In *United States v. Harrington*, 388 F.2d 520 (2d Cir. 1968) the Court observed:

The judicial protection against the sweeping or irrelevant order is particularly appropriate in matters where the demand for records is directed not to the taxpayer but to a third-party who may have had some dealing with the person under investigation.

*Id.* at 523. *See also Venn v. United States*, 400 F.2d 207 (5th Cir. 1968) [citing this language from *Harrington* approvingly].

Basically, Coopers & Lybrand objects to revealing the contents of the Audit Program to the IRS because the Service would be required, as a matter of law, to turn over to Johns-Manville in subsequent litigation whatever papers it may have secured from C & L in this proceeding. We find from the testimony and evidence presented that the Audit Program in issue here was tailor-made for the C & L audits of Johns-Manville, it did not follow any standard format, and it did not change appreciably from year to year. Nor are we persuaded by the evidence presented that Coopers & Lybrand could effectively alter the Audit Program in each subsequent and succeeding year prior to an audit of J–M's financial statements.

The implications of surrendering to the client an Audit Program prepared in connection with the examination of corporate financial statements were presented to the Court by Mr. Ed Kerans, general practice partner with Coopers & Lybrand:

Basically, we don't disclose the program to our clients because of the nature of the business we are in, so to speak, and that is checking the fair presentation of financial statements that have been prepared by our clients.

In effect, we are independently verifying that those financial statements represent a fair presentation, that they are correct. To do so, we have to establish this plan for many companies. We don't check every transaction so, accordingly, there's a great deal of judgment that has to go into formulating this plan to fit a set of circumstances of a particular client.

It's necessary that only we be aware of what this plan is. In effect, if our clients were aware of what our plan was, they would have an ability to know what areas we were going to look at and what areas

we were not going to look at in a particular year. This would certainly reduce substantially the value of the judgment that we are making to reduce the scope of our work and yet make it adequate enough to arrive at an opinion so it's extremely important that they not be able to, in effect, know what areas we are looking into.

THE COURT: In effect, if they know that, they would play to the grandstand; is this what you are saying?

A: Yes.[6]

Although we do not regard respondents' argument as sufficiently persuasive to deny the IRS petition on policy grounds alone, had the Government sustained its burden of establishing relevance, we have nevertheless given the argument due consideration.

In our view, the Audit Program of Coopers & Lybrand is neither relevant nor material to a determination of the tax liability or the correctness of the tax returns of Johns-Manville. Additionally, we find significant policy consideration which further supports our denial of the petition insofar as it seeks production of the C & L Audit Program.

We next approach the issue of production of the Tax Pool Analysis file and related papers. In this regard, it is the position of the respondents, Coopers & Lybrand and Johns-Manville Corporation, that (1) all data relevant to J–M's tax liability has been made available or is available to the IRS; (2) the IRS has failed to establish the relevancy of the Tax Pool in connection with this investigation; and (3) considerations of public policy should dictate that we deny the petition in this regard as well.

 Initially, the taxpayer-intervenor contends that the Service is already in possession of the information sought from the Tax Pool. In our view, this element of the *Powell* test is one of both form and substance and is designed to protect taxpayers and third parties from the abuse of summons power which was present in *United*

*States v. Pritchard*, 438 F.2d 969 (5th Cir. 1971). *See also United States v. Theodore*, 479 F.2d 749 (4th Cir. 1973). In *Pritchard* a tax attorney was summoned to testify and to produce for examination tax return files and related work papers concerning his client, the taxpayer under investigation. The Fifth Circuit affirmed the District Court's dismissal of the enforcement proceedings upon a finding that the files sought from the attorney had previously been examined by an IRS agent while in the hands of the taxpayers' accountant, before they were transferred from the taxpayers' accountant to their attorney.

In the instant case, it is clear that the IRS has not in fact seen the Tax Pool files. The taxpayer-intervenor's position from the very beginning of these proceedings has been that enforcement should be denied—not because the Government has already seen the Tax Pool, but because the information contained therein has no relevance to the investigation. Consequently, we cannot conclude that the information sought is already within the possession of the IRS in the sense intended under *Powell*.

We are not unmindful of the fact that since 1913 every federal income tax of J–M has been audited by the IRS. During the course of the most recent audit of J–M conducted by the IRS for the taxable years 1971 and 1972, J–M produced over 100,000 pages of corporate records for the inspection and analysis of the IRS (including computer runs, corporate minutes, invoices, check vouchers, pay-roll records, inventory records, and assorted other data). The production of these documents for the inspection and analysis of the IRS took over three full man years in terms of time and cost the corporation over $100,000.*

 Prior to and on or about February 5, 1975, C & L and its partners, employees, and attorneys collected from sources throughout the United States where J–M maintains facilities, more than 60,000 pages of factual information for the inspection of

---

6. Transcript of record at pp. 148–49.

* The evidence is clear that IRS review and audit is on-going on a continuous basis.

the IRS agents. This data was in addition to those corporate records previously produced for the IRS by J–M. Further, between December 1974 and February 1975, J–M and C & L arranged personal interviews for the IRS with all of their respective officers, executives, employees, and partners with whom the IRS wished to speak, as well as interviews with J–M's attorneys and several other individuals in New York City and Washington, D. C. Cooperation of J–M is manifest.

The taxpayer-intervenor's position is that because the IRS has conducted this extensive audit and has seen all records and other data which form the factual basis of the Tax Pool, it therefore is already in possession of the information sought and fails to satisfy the third criteria of *Powell*. Because we do not construe the Government's authority to be limited to summoning information which the Service has not already reviewed in another form, we cannot conclude that this is a sufficient basis alone upon which to deny enforcement of the summons insofar as it seeks production of the Tax Pool. We nevertheless regard it as a factor to be given appropriate weight in balancing the additional contentions urged by J–M.

■ Johns-Manville's principal argument has been that the Tax Pool is not relevant to the IRS investigation. Under the *Powell* criteria set out above, the Service must show that the material sought is relevant to the purpose of the inquiry. Failing that, the summons is overbroad and unreasonable under the Fourth Amendment. This element of the *Powell* test is perhaps the most difficult to apply since in *Powell* the question of relevance was not in issue. Hence, we perceive that that opinion affords only the barest outline of the criteria to apply to test relevance. Our consideration of subsequent citations of authority suggests that

the question of what information may be relevant to an IRS investigation is one which does not lend itself to easy resolution, *Harrington, supra* at 524; and is one which we must determine on a case by case basis, *Matras, supra* at 1274.

As a threshold matter, we are of the view that actual records of transactions should be distinguished from other data which may incidentally touch upon past or future transactions. When the IRS seeks actual records of potentially taxable transactions from a taxpayer or from a third party, relevancy is implicit and production is usually required; where the data sought are not records of transactions the courts are prone to press the Service to a higher standard of relevance. *See, e. g., United States v. Matras, supra; United States v. Harrington, supra;* and *Foster v. United States, supra.*

In the instant case, the IRS has not challenged respondents' argument that the Tax Poll does not contain records of transactions. The evidence is clear that the Tax Pool was not prepared in connection with the preparation and filing of J–M's tax returns.[7] The IRS here does not seek records of corporate transactions or the data which customarily are maintained in support of company transactions; instead it seeks private thoughts and theories of the taxpayer.

Consolidated financial statements are prepared annually by Johns-Manville for inclusion in reports to stockholders and certain mandatory filings with the Securities and Exchange Commission. Coopers & Lybrand examines and reports on these consolidated financial statements. C & L is required to account for the existence of any contingent liability as required by Accounting Research Bulletin No. 50, 7089 (October 1958), issued by the American Institute of Certified Public Accountants. This section

---

7. Under questioning by counsel for taxpayer-intervenor, Special Agent John G. Shea testified:

Q: Is it your belief, based upon what you have read, that the Tax Pool Analysis file had anything to do with the preparation of the income tax returns?

A: Not directly, only indirectly, through the fact that they were—that it was prepared for the financial statements of Johns-Manville based on the books and records of Johns-Manville which were also used to prepare the tax returns. [Transcript of record at p. 45.]

defines a contingency as " . . . an existing condition, situation, or set of circumstances, involving a considerable degree of uncertainty, which may, through a related future event, result in the . . . incurrence or avoidance of a liability . . . " Among the items considered by C & L during its examination of the J–M financial statements is the adequacy of J–M's provision for income tax liability, since possible assessments of additional income taxes would be such a contingency.

The taxpayer-intervenor contends that the information contained in the Tax Pool is conjectural, interpretive, deliberative, and judgmental and it contains the ideas, analyses, theories, and accounting and legal opinions of J–M's tax personnel. Further, it is contended that (a) these ideas, analyses, theories, and opinions relate to the possibility of a legitimate difference of opinion with the IRS and foreign taxing authorities over the interpretation and application of certain United States and foreign tax laws and (b) the estimates of J–M which are contained in the Tax Pool are not required to be maintained by the IRS but are required to be created by J–M for financial reporting purposes and were communicated to Coopers & Lybrand for a limited purpose unrelated to the preparation of income tax returns.

From our close study of the testimony, we cannot conclude upon the facts presented that the Tax Pool is inherently relevant to an IRS investigation of the correctness of J–M's federal income tax returns for 1971 and 1972.

The Government's case in support of its position that the Tax Pool was relevant to the inquiry into J–M's tax liability began with a presentation of certain items which had remained unresolved during the course of the current audit. Upon questioning by the Court, Mr. Grissom testified:

> THE COURT: Let's approach it this way: Your position is that you need additional information from the taxpayer; is that correct, please?

GRISSOM: Yes, sir.

THE COURT: And also from the auditor, is that correct?

GRISSOM: Yes, sir.

THE COURT: And executives of Coopers & Lybrand; is that correct, please?

GRISSOM: That's correct.

THE COURT: Succinctly stated, why?

GRISSOM: To verify the deduction on the filed income tax return for taxes, to verify the liability for deferred and current taxes, to determine the earned surpluses of each of the member companies, and to determine the parent companies investment in the stock of the subsidiary companies. These are the four principal reasons . . . [8]

The taxpayer-intervenor took the position, and presented evidence and testimony to the effect, that the data sought by the IRS to complete the audit and resolve these areas of concern did not appear in the Tax Pool. The Government did not seek to refute this contention, but then took the position that the Tax Pool might shed some light on other, yet unidentified, areas of tax liability. Under questioning by counsel for the Government and the Court, Mr. Grissom testified:

> COUNSEL: In other words, you still need the Tax Poll Analysis file for the relevancy it has to the overall correctness of the income tax return, any discussions of any items on the tax return?

GRISSOM: Yes, I could use it for that, yes.

THE COURT: You say you could use it for that. Is it necessary, and this is your question; is that correct?

GRISSOM: I think it might be necessary to verify some of these book and tax differences on this reconciliation. Without having seen the file, I'm reluctant to say yes or no.[9]

██ The Second Circuit, in *Harrington, supra,* rejected the argument that the Service be required to establish relevance

8. Transcript of record at p. 65.

9. *Id.* at p. 98.

through "clear and unequivocal evidence", but nevertheless concluded:

> . . . the Government may not defend a failure to indicate sufficient relationship of records to the investigation solely on the basis that some chance of relevance exists or some possibility of relation remains, and no one can discern more until after examination. The personal interest cannot be so blithely brushed aside.

*Id.* at 524. We are cognizant of the Government's position that at the time a summons is issued the Government has not seen the records sought, and therefore cannot state with precision what light they may shed upon the taxpayer's correct income tax liability. Nevertheless, we do not regard this argument as sufficiently persuasive to relieve the Service of the burden of demonstrating some justifiable expectation that the information sought is relevant to the purpose of the inquiry.

Prior to and during the hearing, personnel from Johns-Manville made several efforts to provide the IRS agents with the reconciliations about which they still had questions. The Service's witnesses testified that they intended to continue efforts to complete the audit from the books and records of the corporation. Under questioning by the Court, Mr. Grissom testified, at the close of the two-day hearing:

> GRISSOM: I will made that reconciliation. . . . if I have any unexplained differences I will go into those.
>
> THE COURT: But you do this all the time, don't you?
>
> GRISSOM: Yes, it's standard operating procedure.
>
> . . . . .
>
> THE COURT: You don't need this lawsuit to accomplish that purpose, do you?
>
> GRISSOM: No, sir.[10]

Finally, the Government has asserted that the Tax Pool is relevant to the instant investigation because it may reveal some element of intent involved in the preparation of the J–M tax returns. Special Agent Shea is employed in the Service's Intelligence Division which has responsibility for determining the correct tax liability and investigating the possibility of tax fraud. Central to such an investigation must be an examination of the degree of intent involved in an attempted evasion of taxes. Petitioners argue that the Tax Pool will explain why an item was given a particular tax treatment, and thereby show the intent of the officers and employees of Johns-Manville when they gave a particular item a particular tax treatment on the Johns-Manville income tax return. We are not persuaded. The uncontradicted evidence establishes to our satisfaction that the Tax Pool Analysis file and related papers were not used or compiled in connection with the preparation or filing of J–M's income tax returns. Coopers & Lybrand has no responsibility in regard to determining or reporting on J–M's tax liability. The limited purpose for which the Tax Pool was created by J–M and communicated to C & L was unrelated and distinct from J–M's tax liability or the preparation of J–M's tax returns.

In *United States v. Matras, supra,* the Eighth Circuit sustained an order of the District Court denying enforcement of an IRS summons which sought production of the company-wide budgets of Northern Natural Gas Company and its subsidiary and affiliated companies. The District Court denied enforcement of the summons upon a finding that:

> The budgets are only a projection of what the actual transactions would be. Once the transactions have occurred, it is the actual records of those transactions, not proposed budgets, that are relevant to a determination of the tax liability that flowed from the transactions. Moreover, the evidence indicates that the I.R.S. has been or will on request be furnished with the Work Order Budget Comparison ledger sheets, which compare the information in the budget with the actual transactions. The I.R.S. has failed to sustain its burden of showing relevancy and that it does not already have possession of the

---

10. Transcript of record at p. 336.

information as required by *United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).

*Id.* at 1272. The facts in the instant controversy are not unlike those present in *Matras.* The information contained in the Tax Pool is conjectural and theoretical. In *Matras,* the District of the actual transactions, not proposed budgets, that are relevant to a determination of the tax liability. In so doing, the Court concluded that the Government had failed to sustain its burden of showing relevance by alleging a general need for a "road map."

In formulating a test of relevancy, we have considered the view of the Second Circuit in *United States v. Harrington, supra,* that the IRS must establish some "indication of a realistic expectation rather than an idle hope that something may be discovered." In *United States v. Williams, supra,* the Court denied enforcement of a summons upon a finding that the IRS had failed to show that the information sought was more than "marginally relevant" and that, in light of the burden imposed by production, the Government had failed to meet a standard of reasonableness.

As noted the information sought in the Tax Pool is highly speculative and conjectural. During the evidentiary hearing, two experts testified, namely Marvin Stone and James Gehres. Mr. Stone is a senior partner in Stone, Gray & Company, a Denver accounting firm. He is Past President of the American Institute of Certified Public Accountants and Past President of the Colorado Society of Certified Public Accountants. Mr. Stone has not been associated in any prior capacity with respondents in this action. Mr. Gehres is a career accountant in the Denver IRS Audit Division. He holds Bachelor's and Master's Degrees in Accounting and a law degree. Both witnesses expressed opinions on auditing processes and standards for public and private companies; tax matters; and public policy implication of requiring release to the IRS of information similar to that in the Tax Pool. Excerpts from Mr. Stone's testimony follow:

. . . I would not presume to suggest, Your Honor, that a taxpayer, be it a large corporation or a small one, be empowered in any way to withhold the facts on which they have based their income tax return or the basis on which they have computed their tax. This certainly is part and parcel of our system of self-assessment, and were we to eliminate that, the Government would be terribly hampered, but what I'm concerned about is this ability of the Government to look into the client's mind to determine not what the facts are on which the tax is based, but what the worst possible nightmare is the client can conceive can happen if every assumption on which he based his tax were to go against him in some kind of litigation.

He may think up contingencies even more lurid than the worst contingencies a revenue agent comes up with, and with that information available to the revenue agent just for the asking, I think it would terribly impede and I think eventually destroy the system of auditing that we have established because it would eliminate the freedom that the client feels of being able to muse with us about, well, what if this capital gains is treated as an ordinary income? What are the potentials? What are the chances? Well, the chances are 60–40 or 90–10, one way or the other.

These are the kinds of things that, as I understand it, are contained in the Tax Pool Analysis file and in smaller clients it's even more common because we have things like what is a reasonable officer's salary? Well, that is litigated continually.

It's just a matter of judgment as to whether this man is worth 20,000 or 50,000 or 90,000 to run that corporation.

Another thing would be, for example, what is an unreasonable accumulation of surplus in a small closely held corporation? That's an issue that would never be present with a company like Johns-Manville.

Now, this is a complete matter of judgment as to whether this business needs to

accumulate these earnings for a potential expansion or for working capital or whether they are just keeping their earnings in there to prevent having to pay a dividend out to a high bracket stockholder.

Now, these are the kinds of problems which we are continually in contact with our client about, are advising the client, are getting his feedback. If we were hampered in any audit situation by the fact that the client knows that if he gives us any data about that that it's going to be readily available to the Government, I cannot imagine how we would be able to render audit opinions for that client for very long. It would just absolutely cut off our communication, and if I were the client, I would be the first to admit that that is the way I would feel.

I can't see how he can talk to me freely—I'm talking now only about opinions and ideas and thoughts and nightmares, if you will.[11]

▮ We are not unmindful of the view in this Circuit and elsewhere that Section 7602 is to be accorded a liberal construction in line with the considerations essential to a self-reporting system. *United States v. Continental Bank & Trust Co., supra.* Nevertheless, once a summons is challenged, it is our duty to scrutinize it carefully to determine whether it seeks information relevant to a legitimate investigative purpose. *United States v. Bisceglia, supra,* at 146. *See also United States v. Humble Oil and Refining, supra.* ("John Doe" IRS summons disallowed where primary purpose of summons was research). Upon the briefs submitted in this case on the issue of the Tax Pool Analysis file and related papers, and considering the testimony and evidence presented, we are of the view that the Government has failed to sustain its burden of establishing the relevance of the Tax Pool to the current investigation. The evidence was uncontroverted that the Tax Pool was not prepared in connection with or used to facilitate the preparation and filing of J–M's federal income tax returns. The C & L firm has no responsibility for any J–M tax matters. The Government's showing of relevance is open to serious question; and extending even minimal weight to J–M's policy argument, we conclude that the balance is struck in favor of the taxpayer. We have also considered the burden of additional time and expense imposed by production of J–M's Tax Pool as requested by the IRS. These concerns are not insignificant.

### III.

### CONCLUSION

We have scrutinized the purpose of the summons in question here and the underlying investigation. We have considered the memoranda and evidence submitted, as well as the arguments presented by the parties. We cannot conclude that the facts sought are not already available to the IRS or that there is sufficient nexus between the information requested and the purpose for which it is summoned. Relevance has not been established as to requested documents in the hands of J–M or C & L; further, the information sought is not factual. Accordingly,

IT IS ORDERED that the petition be denied and the same hereby is DENIED and the petition and cause of action DISMISSED.

IT IS FURTHER ORDERED that the Order to Show Cause be and the same hereby is DISCHARGED. Judgment to enter for Respondents and Respondent in Intervention.

This opinion and order constitute findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

---

11. Transcript of record at pp. 254–56. The testimony of Mr. Gehres disputed the public policy and audit considerations expressed by Mr. Stone.